**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 1, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

RICHARD GRISSOM,

Plaintiff-Appellant,

v.

ROGER WERHOLTZ, Secretary of
Corrections, in his official and individual
capacity; RAYMOND ROBERTS,
Warden, El Dorado Correctional Facility,
in his official and individual capacity;
LOUIS E. BRUCE, Former Warden,
Hutchinson Correctional Facility, in his
official and individual capacity;
SAM CLINE, Current Warden,
Hutchinson Correctional Facility, in his
official and individual capacity;
DAVID R. MCKUNE, Warden, Lansing
Correctional Facility, in his official and
individual capacity;
DUANE MUCKENTHALER,
Corrections Counselor/Unit Team
Manager, Lansing Correctional Facility,
in his official and individual capacity;
DEBRA MCCONAGHY, Corrections
Counselor II, Hutchinson Correctional
Facility, in her official and individual
capacity; THOMAS W. PHELAN,
Chaplain, El Dorado Correctional
Facility, in his official and individual
capacity,

Defendants-Appellees.

No. 12-3255
(D.C. No. 5:07-CV-03302-SAC)
(D. Kan.)

## ORDER AND JUDGMENT[*]

Before **KELLY**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and **HOLMES**, Circuit Judge.

Richard Grissom filed a 42 U.S.C. § 1983 action against defendants, alleging numerous violations of his constitutional rights during his incarceration at three Kansas correctional facilities: El Dorado Correctional Facility (EDCF), Lansing Correctional Facility (LCF), and Hutchinson Correctional Facility (HCF). The district court granted summary judgment in favor of defendants. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I. Background

Mr. Grissom was convicted after a jury trial in Kansas of three counts of first-degree murder, one count of aggravated kidnapping, four counts of robbery, two counts of aggravated burglary, and one count of misdemeanor theft. He is serving four consecutive life sentences for the first-degree-murder and aggravated-kidnapping convictions.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Mr. Grissom has been in administrative segregation since August 4, 1996. He was initially placed in segregation while incarcerated at LCF, pending an investigation into his alleged involvement in narcotics trafficking at the prison. In October of that year, his status was changed to "Other Security Risk" after the investigation found that he was responsible for the procurement and trafficking of contraband drugs at LCF. In December 1996, Mr. Grissom was transferred from administrative segregation at LCF to administrative segregation at EDCF. When Mr. Grissom asked for an explanation for his continued retention in segregation, he was informed of the results of the investigation and told that "[d]ue to the elaborate method used to traffic [the] contraband drugs, you are considered a threat to the security of this facility if released to general population." Aplt. App, Vol. III, at 459.

On February 15, 2001, Mr. Grissom's status was changed to "Extreme Escape Risk" after prison officials intercepted a letter from an outside source in which the sender indicated a desire to aid Mr. Grissom in escaping LCF once he was released back into general population. His status was changed back to "Other Security Risk" on June 6, 2003. He remained in administrative segregation.

On November 25, 2003, while Mr. Grissom was in administrative segregation at EDCF, prison officers found several contraband items, including a cellular phone with extra batteries and accessories, in his cell. He was charged with trafficking in contraband in a correctional institution, a felony. He pled no contest and was placed in disciplinary segregation for thirty days.

On January 26, 2005, while in administrative segregation at EDCF, a cellular telephone was found on the floor near Mr. Grissom during a strip search. He was charged with a violation of Kansas administrative regulations prohibiting the possession of dangerous contraband by inmates. He pled no contest and was placed in disciplinary segregation for thirty days. In February, he was transferred to administrative segregation at LCF.

On June 1, 2005, while Mr. Grissom was in administrative segregation at LCF, prison officers discovered numerous items of contraband in his cell, including: two cellular telephones, chargers for the phones, sandpaper, razors, a soldering iron, box cutter blades, a screw driver and drill bits. Mr. Grissom pled not guilty to the charge of possessing dangerous contraband. He participated in a disciplinary hearing and was found guilty. He was given forty-five days in disciplinary segregation. A week later he was transferred to administrative segregation at HCF.

Because of the seriousness of Mr. Grissom's three contraband violations while he was in administrative segregation, Defendant Louis E. Bruce, the warden at HCF during that time, felt compelled to develop a more restrictive protocol to manage Mr. Grissom. Mr. Bruce stated in his affidavit that:

> Cell phones are one of the most concerning devices an inmate can possess. Not only do cell phones permit the inmate to communicate beyond the ability of the correctional facility to monitor him, but an inmate with a cell phone can actually execute an escape plan with those on the outside, which was another serious concern about [Mr. Grissom] possibly attempting an escape.

*Id.*, Vol. I, at 121-22.

- 4 -

The protocol included video surveillance of Mr. Grissom's cell, limited contact with staff members, more frequent searches of his cell, limitations on his time in the yard and in the showers, and inspections of any items that were given to him. Another part of the protocol was to rotate Mr. Grissom between HCF, LCF, and EDCF "to make it more difficult for him to obtain these items of contraband by reducing his opportunity to establish unduly familiar relationships with staff." *Id*. at 124. Defendants David R. McKune and Duane Muckenthaler at LCF and Defendant Raymond Roberts at EDCF adopted and implemented a similar protocol for Mr. Grissom.

Since May 2005, Mr. Grissom's confinement in segregation has been reviewed monthly and semi-annually. Mr. Grissom has had the opportunity to participate in the reviews. He has elected to participate in some but not all of the reviews.

In December 2007, Mr. Grissom filed a pro se complaint in district court, raising a number of claims about the conditions of his confinement. The district court dismissed his first four claims for failure to state a claim for relief.[1] The defendants filed a *Martinez* report regarding the remaining claims and then a few weeks later filed a motion to dismiss those claims. The district court gave notice to the parties that it was converting the motion to dismiss into a motion for summary judgment. Mr. Grissom retained counsel who filed a response to the motion.

---

[1] Mr. Grissom is not appealing the dismissal of those four claims.

Defendant Roger Werholtz, the Kansas Secretary of Corrections at that time, moved to be dismissed from the case, arguing that Mr. Grissom failed to show his personal participation in the alleged constitutional violations. The other defendants moved for summary judgment on the basis of qualified immunity, asserting that their actions did not violate any federal constitutional or statutory right. The district court granted judgment in favor of all defendants. Mr. Grissom now appeals from the district court's decision.

II. Discussion

Generally, we review a grant of summary judgment de novo, applying the same legal standard as the district court. *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007). Under that standard, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Review of summary judgment orders in the context of qualified immunity is slightly different. *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id*. (internal quotation marks omitted). "In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party." *Id*.

On appeal, Mr. Grissom contends that the district court erred in dismissing Mr. Werholtz for lack of personal participation and in granting summary judgment in favor of the other defendants on the basis of qualified immunity. He asserts that the district court erred in determining that he had not demonstrated a violation of his constitutional rights on three of his claims.

In claim six, Mr. Grissom alleged that his First Amendment rights were violated when Defendants Werholtz, Bruce, Sam Cline and Debra McConaghy deprived him of magazine subscriptions while he was housed at HCF. In claim seven, Mr. Grissom alleged that Defendants Werholtz, McKune, Bruce, and Cline violated his due process rights under the Fourteenth Amendment and the cruel and unusual punishment clause of the Eighth Amendment by retaining him in administrative segregation from June 2005 to the present. In claim ten, Mr. Grissom alleged that Defendants Werholtz and Thomas W. Phelan violated the Free Exercise Clause and Establishment Clause of the First Amendment by forcing him to change his religious preference in order to retain possession of a Celtic-cross necklace.

A. *Magazine-Subscription Claim (Claim Six)*

With respect to Mr. Grissom's magazine-subscription claim, the district court concluded that the prison regulation prohibiting inmates in segregation from subscribing to magazines was reasonably related to a valid penological interest. *See* Aplt. App., Vol. III, at 566-68 (applying four-factor analysis from *Turner v. Safley*, 482 U.S. 78, 89 (1987)). In reaching this conclusion, the district court noted that

- 7 -

Mr. Grissom had not addressed the "logical safety rationale for limiting his access to magazines—namely, the need to prevent him from receiving or passing contraband hidden in magazines, or from using magazines for bartering." *Id*. at 567. The court noted also that Mr. Grissom had alternative means of exercising his First Amendment right as he had access to reading materials from the prison library. The court further noted that to accommodate Mr. Grissom's request would have required the prison to grant him an exception from its general order excluding segregation inmates from the privilege of subscribing to magazines.

On appeal, Mr. Grissom relies on an unpublished district court decision, *Prison Legal News, Inc. v. Werholtz*, No. Civ. A. 02-4054-MLB, 2007 WL 2875113 (D. Kan. Oct. 1, 2007), to support his position that the district court erred in its consideration of this claim. In that case, the district court concluded that the regulations requiring all prisoners in the general population to purchase magazine subscriptions from their inmate account—which limited the amount an inmate could spend on such subscriptions and effectively prohibited gift subscriptions from families or friends outside of prison—was not reasonably related to the penological interests identified by the prison. *Id*. at *1, *6. One of the three penological interests identified in that case was security concerns, *id*. at *3, which is similar to the penological interest identified here.

An unpublished case from a district court, however, is not precedent that this court must follow. Moreover, the *Turner* analysis is a case-specific analysis. The

- 8 -

*Prison Legal News* case did not involve the regulation at issue here prohibiting inmates in segregation from subscribing to magazines, nor did it involve an inmate with Mr. Grissom's history of possessing dangerous contraband. And, as the district court noted, the Supreme Court has upheld a prison regulation prohibiting access to magazines for inmates in the most restrictive level of that state's long-term segregation unit, *see Beard v. Banks*, 548 U.S. 521, 524-526 (2006). Under the circumstances in this case, we see no error in the district court's determination that Mr. Grissom failed to raise a material question of fact regarding the facial or as-applied constitutionality of the magazine-subscription prohibition for inmates in segregation.

B. *Religious Liberty Claim (Claim Ten)*

Mr. Grissom received a Celtic cross in December 2003 that was initially approved by Chaplain Dow at EDCF and blessed by a Catholic priest in April 2006. In August 2007, Mr. Grissom ordered a new chain to hold his cross. When Defendant Phelan, another chaplain at EDCF, came to Mr. Grissom's cell to deliver the chain, he asked to see the cross. Defendant Phelan told Mr. Grissom that the Celtic cross was not approved for Catholics under the relevant prison regulation and would need to be confiscated unless he changed his religious preference. Mr. Grissom had a change-of-religion form in his own documents and filled one out, stating a change from Catholic to Protestant. He gave it to Defendant Phelan so he could keep his Celtic cross. He then filed a grievance, but was unsuccessful. The

response to the grievance notes that Mr. Grissom could submit a "Request for Accommodation of Religious Practices" to seek an exception to the regulation governing approved religious artifacts for each religion. Aplt. App, Vol. I, at 187. Mr. Grissom did not file such a request.

Mr. Grissom stated in his complaint that he "had no alternative but to change his religious denomination to Protestant on paper." *Id*. at 18. But the district court noted that Mr. Grissom "chose to change his stated religious affiliation so he could keep the Celtic cross, but did not seek an exception to the policy which may have permitted him to retain both his Catholic religion and his cross." *Id*., Vol. III, at 583. The court noted also that Mr. Grissom conceded in his complaint that although he changed his religious denomination on paper, he did not change it "in his heart or practices." *Id*., Vol. I, at 18-19. The district court ultimately concluded that Mr. Grissom had not established the existence of a genuine issue of material fact regarding defendants' violation of his free-exercise rights because the relevant prison regulation did not substantially burden any sincerely-held religious belief of his nor did any defendant coerce him into changing his religion.

On appeal, Mr. Grissom argues that there are factual disputes surrounding his interaction with Defendant Phelan over the Celtic cross, but he does not identify how those disputes are material. He also argues that defendants did not provide a valid penological interest for the regulation. But the district court concluded that defendants did not need to make such a showing because Mr. Grissom failed to meet

the first part of the two-step inquiry of showing that the prison regulation "substantially burdened any sincerely-held religious belief." *Id*., Vol. III, at 584; *see also id*. at 582 (setting forth two-step inquiry to show a constitutional violation based on a free exercise claim). We see no reversible error in the district court's determination on this issue.

### C. *Excessive-Isolation Claims (Claims Seven and Nine)*

Mr. Grissom's complaint involved two claims related to his extended placement in administrative segregation. The district court determined that many of the acts alleged in claim nine were barred by the statute of limitations and that any timely acts alleged in claim nine were duplicative of those alleged in claim seven. Mr. Grissom does not challenge these rulings on appeal. Accordingly, he has waived any challenge to the district court's disposition of claim nine. *See Bronson v. Swenson*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue.").

In his complaint, Mr. Grissom asserted that defendants' decision to keep him housed in a segregation unit from June 2005 to the present constituted excessive isolation in violation of the due process clause of the Fourteenth Amendment and of the cruel and unusual punishment clause of the Eighth Amendment. The district court concluded that Mr. Grissom's allegations did "not come within the purview of the Eighth Amendment's prohibition against cruel and unusual punishment." Aplt. App., Vol. III, at 577. In reaching this conclusion, the district court explained

that "[t]he denial of privileges which normally accompanies confinement in administrative segregation does not amount to a denial of life's necessities or present a sufficiently serious potential for harm, nor does the record reveal officer's deliberate indifference to any risk to plaintiff's health or safety." *Id.*

Mr. Grissom does not appear to be challenging the district court's disposition of the Eighth Amendment portion of claim seven. He never mentions the Eighth Amendment, how the district court erred in its treatment of that claim, or how his allegations met the standard for showing such a constitutional violation; instead, his briefing focuses almost exclusively on the district court's conclusion that he had not established a protected liberty interest that would implicate the due process clause of the Fourteenth Amendment. *See* Aplt. Br. at 14-21. Under these circumstances, we conclude that he has waived any challenge to the district court's determination on the Eighth Amendment portion of claim seven. *See Bronson*, 500 F.3d at 1104 ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

With respect to the due process portion of claim seven, the district court evaluated Mr. Grissom's claim considering the four factors identified in *Estate of DiMarco v. Wyoming Department of Corrections,* 473 F.3d 1334, 1342-43 (10th Cir. 2007), for determining whether placement in administrative segregation implicates a protected liberty interest that would give rise to a due process claim. Those factors are: (1) whether "the segregation relates to and furthers a legitimate, penological

- 12 -

interest, such as safety or rehabilitation"; (2) whether "the conditions of the placement are extreme"; (3) whether "the placement increases the duration of confinement"; and (4) whether "the placement is indeterminate." *Id.* The district court concluded that all four factors weighed against a protected liberty interest.

With respect to the first factor, the court found that defendants had met their burden of showing a reasonable relationship between Mr. Grissom's isolation and the prisons officials' asserted penological interests, noting Mr. Grissom's propensity for obtaining dangerous contraband and the security risks created by such behavior. On the second factor, the court concluded that the conditions Mr. Grissom endured in segregation were not extreme or atypical. On the third factor, the court noted that Mr. Grissom is serving four life sentences and his parole-eligible date has not been affected by his placement in segregation. Finally, on the fourth factor, the court found that Mr. Grissom's placement in administrative segregation is not indeterminate because "the prisons conducted regular reevaluations of [Mr. Grissom's] placement in administrative segregation via twice-yearly program reviews, as well as various monthly reviews." Aplt. App., Vol. III, at 575.

The court concluded that Mr. Grissom had "failed to raise a material question of fact that his long-term confinement in administrative segregation created a liberty interest. Therefore, no particular process was constitutionally due or required." *Id.* at 576 (internal quotation marks omitted). But the court also noted that, even if

Mr. Grissom had a protected liberty interest, the facts did not demonstrate that he was denied due process.

On appeal, Mr. Grissom argues generally about the negative effects of solitary confinement and the long duration of his segregation. He also contends that there are factual disputes about the reasons for his continued placement in segregation, pointing to apparent inconsistencies in the defendants' summary judgment motion. But Mr. Grissom's chronological prison file reflects the following reasons for his continued placement, which is consistent with the district court's analysis:

> Due to [Mr. Grissom's] involvement in drug distribution and drug sales at LCF, the escape correspondence intercepted by I&I and his recent possession of prohibited items, he continues to pose a threat to the safety and security of any facility in which he may be housed. His status will remain as being housed in long term segregation on Other Security Status.

*Id.*, Vol. I, at 209. Mr. Grissom also conducts his own evaluation of the *DiMarco* factors and concludes that they weigh in his favor, but we do not find his analysis persuasive. Finally, Mr. Grissom does not address the district court's conclusion that, even if Mr. Grissom established a protected liberty interest, he received all of the process that he was due. We see no reversible error in the district court's consideration of Mr. Grissom's due process claim.

D. *Personal Participation by Defendant Werholtz*

The district court explained that § 1983 actions require "personal participation in the specific constitutional violation," and "that the denial of . . . grievances alone is insufficient to establish personal participation." *Id.*, Vol. III, at 556 (alteration in

- 14 -

original) (internal quotation marks omitted). Defendant Werholtz submitted an affidavit in which he swore that he "was not directly involved with anything connected with [Mr. Grissom's] conditions of confinement" and that he "did not have any direct involvement in anything about which [Mr. Grissom] now complains." *Id*., Vol. I, at 117-18. He explained that the protocol for managing Mr. Grissom was developed by Warden Bruce and that "[t]he details of the housing rules at each facility were determined by each facility's staff." *Id*. at 118. In the district court and on appeal, Mr. Grissom speculated that Defendant Werholtz had greater involvement in managing the conditions of his confinement, but he did not provide any specific facts to create a factual dispute on this issue. As the district court correctly concluded, "Defendants' admissible evidence on this issue defeats [Mr. Grissom's] speculation to the contrary." *Id*., Vol. III, at 557.

III. Conclusion

We agree with the district court's decision to dismiss Defendant Werholtz for lack of personal participation. We also agree with the district court's decision that the other defendants were entitled to qualified immunity because Mr. Grissom did not establish a genuine issue of material fact regarding their alleged violations of any of his constitutional rights. Accordingly, for the reasons set forth herein and more fully

stated in the district court's thorough and well-reasoned thirty-eight-page

memorandum and order, we affirm the judgment of the district court.

Entered for the Court


Jerome A. Holmes
Circuit Judge